IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RAY MARCILLE, )<br>       PLAINTIFF, )<br>)<br>V. )<br>**CITY OF KANSAS CITY, MISSOURI,** )<br>SERVE: MARILYN SANDERS CITY CLERK )<br>    414 E. 12th Street, 25th Floor )<br>    Kansas City Missouri 64106 )<br>       **DEFENDANT.** ) | Case No. 4:19-CV-01016 |

## COMPLAINT

COMES NOW Plaintiff, Ray Marcille, by and through counsel and for his Complaint against the defendant City of Kansas City Missouri ("KCMO"), and states as follows:

### PARTIES JURISDICTION AND VENUE

1. Plaintiff Ray Marcille had been a long-time employee of the City of Kansas City, Missouri, working with the city for almost 32 years and for 22 years was the Superintendent of the Signs and Marking section of the Public Works department for KCMO.

2. City of Kansas City, Missouri is a municipality organized pursuant to the laws of the State of Missouri and operates as a City Manager of municipal government, lawfully derives its powers from the laws, statutes and Constitution of the state of Missouri and the United States of America.

3. This action arises under the Constitution of the United States of America, and 42 U.S.C. § 1983. The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a) and 42 U.S.C. §1983 for plaintiff's equal protection claim.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 (b).

### FACTS COMMON TO ALL COUNTS AND ADMINISTRATIVE PROCEEDINGS

1

5. Plaintiff during his extensive career as a KCMO employee and most recently for the last 22 years as the Sign and Marking Section Superintendent has served under several supervisors. For a 15 year period he served under Mr. Wei Sun, P.E. who found his job performance to often exceed expectations. During the last seven or so months, Greg Bolon served as his supervisor and did not issue him a performance rating. The ratings that he received from Mr. Sun were typical of his performance found during most of his career.

6. Mr. Wei Sun found that he "substantially and consistently exceeded overall expectations". Mr. Sun, who is now the city traffic engineer, rated him highly for many years and believed Plaintiff to be honest, hardworking, prideful of his work and Sun believed that Plaintiff always did his best in meeting established goals. Sun and Plaintiff would meet and establish performance goals and objectives for the department based on the prior year's performance and Plaintiff always met those targets. Mr. Sun had the overall responsibility for the department and set its budget and performance objectives from one year to the next.

7. In order to meet the goals and objectives of the Signs and Marking section established between Mr. Sun and the Plaintiff, it was necessary to work weekends and for at least one of the two supervisors subordinate to the Plaintiff to also assure that the goals and objectives would be met and be on call to meet a call out when no one else responded.

8. Plaintiff in the performance of his job had two supervisors that he oversaw. Theo Bagby was the signs supervisor and Ed Simsizer was the supervisor of the marking department. These two men oversaw their direct work crews and were responsible for the payrolls of their crews.

9. Unknown to Plaintiff, a criminal scheme had been operating in the Signs and Marking section where a few workers would arrange fraudulent overtime based on bogus callouts

2

for emergency repair or replacement work where no actual work or repairs were performed. The section had a predetermined overtime schedule of workers who had volunteered to be available each workday evening. They would be called out to perform the repair or emergency work should such an occasion arise. On the days that specific employees were scheduled to have to call out responsibility, phone calls would come into the appropriate emergency phone number (often anonymous) and the scheduled workers would then go out and perform the required work, or so it was intended. Also, by union contract these workers were paid a minimum of four (4) hours of overtime. Based on information and belief this scheme was in place from January 2013 until November 2016 and cost the City approximately $58,000 over that period and involved six (6) offenders. At no time was Plaintiff involved in or aware of this scheme until it was disclosed.

10. To facilitate this scheme, it appeared that the workers would have family and friends, and possibly even one another place the bogus emergency calls reporting missing or damaged signs that were considered essential. Then the scheduled overtime employee would supposedly go out and perform the essential sign work and in that fashion generate the overtime pay. Often the workers never went to the sites or left home for work; they just received extra compensation for doing nothing.

11. In May of 2016, Bolon became Plaintiff's supervisor and Sun was reassigned to the City Traffic Engineer position. Almost from the beginning, Bolon was critical of Plaintiff because the weekend work also scheduled a supervisor to be available with the workers and they disputed use of City funds for this purpose. With a total disregard for how the department had operated previously or the purposes for the scheduled weekend work that the goals and objectives of the department were based on as it serviced the 150,000 signs in place throughout the city and the many hundreds of miles of striping and painting that was the responsibility of the section. First

3

Bolon banned supervisors from performing Saturday work; then he sought to curtail all overtime because he felt that Signs and marking was spending too much on overtime when compared to the other Public Works departments. Plaintiff objected because he understood that without the Saturday work and other overtime, he would not be able to meet the section's predetermined goals and objectives and that would reflect poorly on him.

12. By August of 2016, Bolon who had now examined the overtime pay began suspecting that something was not right with the overtime pay and call outs. He isolated the Plaintiff away from any knowledge of his suspicions and undertook a more hands-on investigation that included follow up and actually visiting sites that were allegedly serviced. Bolon involved other City and department employees in his investigation and erroneously suspected that the Plaintiff was somehow involved in this criminal overtime scheme.

13. Over time, the city conducted their investigation and determined who they believed was involved in this criminal conduct. So, in order to interview each of the targeted parties on December 20, 2016 a phony safety meeting was called for the Signs and Marking section.

14. On or about December 20, 2016, Public Works Department and the Human Resources department were present at the phony safety meeting. During that meeting, Plaintiff and the offending workers and others were placed on indefinite suspension so that a further investigation into the overtime scandal that had been uncovered in the Signs and Marking section could be performed. Along with Plaintiff, --- other employees were also placed on suspension pending the outcome of an investigation, characterized as an investigation of alleged theft of funds from KCMO.

15. Also, on that date, Plaintiff and the others were interrogated by two person teams from the Human Resources department of KCMO. Each of the persons present were separated

from one another and not permitted to speak with one another. The unscheduled safety meeting had turned in to an interrogation of the accusations made against each of the employees including the Plaintiff and he was treated as if he was guilty of the crime that had been committed. During the interrogation, Plaintiff expressed shock and surprise over the entire matter and claimed that he knew nothing, nor was he involved in any fashion with the scheme; nor that he received any of the alleged wrongly taken money. Despite his protestations and denial of any knowledge or involvement, Michael Kitchen and another KCMO HR employee accused Plaintiff of violating City policies and procedures.

16. As of December 20, 2016, Plaintiff was suspended pending the outcome of the investigation. Then on January 5, 2017, that suspension was extended, and on January 19, 2017, once again extended. (See Exhibits 1, 2, 3 Attached).

17. On or about February 22, while still suspended and viewed as a co-conspirator, Plaintiff was interviewed a second time, once again by Michael Kitchen and this time Teri Casey, a Senior HR specialist with KCMO. And while no evidence indicated that the Plaintiff had participated in this criminal conduct as a result of these separate interrogations, Plaintiffs was suspended following the first interrogation and was recommended for termination with instruction not to be rehired at the conclusion of his suspension.

18. Also, the Human Resources Rules and Policy Manual provided a three separate review steps for appealing employment discipline. The initial step is the predetermination hearing before a predetermination hearing officer who is to determine if "just cause" exists for the recommended action. From that an Employee may appeal that determination to a three-member Human Resources Board so long as the appeal is sought within ten (10) days of the predetermination Hearing answer. All decisions of the Human Resources Board are then subject

to review by the City Manager and must be submitted within ten (10) days of the decision of the Human Resources Board being delivered.

19. In compliance with the policies and procedures of KCMO, Plaintiff timely requested a predetermination hearing. Then on March 10, 2017, Plaintiff was notified that his investigation had been completed and that his suspension was now changed to a suspension without pay and that management was recommending that he be terminated and a DO NOT HIRE notice be made in his file. At the same time, Plaintiff was notified that on March 22, 2016 the Predetermination Hearing would be held. This first step in the employee discipline appeal process was held before Mr. Nelson Munoz, an attorney employed by the law department of KCMO. On April 4, 2016 a decision was rendered by Mr. Munoz that overruled the permanent termination of the Plaintiff, finding that KCMO failed to prove "just cause" to support Plaintiff's termination; but instead, Mr. Munoz demoted Plaintiff two levels and required that he return to work in the field as part of the department. This demotion represented a significant reduction in pay and benefits because the retirement benefits of KCMO employees are calculated on their last three years' earnings and this would severally reduce Plaintiff's retirement benefits that he had earned from long term loyal service to the City. Plaintiff mindful of the dire consequences that this determination meant to his retirement plans once again timely appealed this decision to the Human Resources Hearing Board. (Copy of the predetermination ruling and the notice of appeal to the Human Resources Hearing Board are attached as Exhibits 4 and 5).

20. On April 12, 2017, Plaintiff gave his notice requesting a Hearing before the Human Resources Board for a de novo hearing of his case. Also, on April 13, 2017, KCMO began implementation of predetermination Hearing Decision. Plaintiff received a notice of his involuntary demotion to non-supervisory Labor leader position that was to be effective April 17,

6

Case 4:19-cv-01016-BP   Document 1   Filed 12/19/19   Page 6 of 10

2017. He was also advised that he would not be eligible for promotion for one (1) year. Plaintiff was then advised to report to work April 18, 2017 as a laborer, prior to his Human Resources Board Appeal might be held.

21. In an effort to preserve his appeal rights and make them meaningful, plaintiff, prior to April 18, 2017, sought to delay his required reporting to the new position until after the Board hearing. However, when the Human Resources and Public Works department refused to permit Plaintiff to delay his report date to his demoted position as a laborer, he offered to use his accrued personal time that he had accumulated so that a determination might be made if the demotion was appropriate, but KCMO was insistent that not only was the demotion to take effect as they had scheduled it, but that he was also to report to his new position or face termination for not reporting and "abandoning" his job. As a result, Plaintiff was forced to retire against his wishes as an active employee in order to preserve his retirement benefits that he had rightfully earn and also elected to pursue his rights and remedies within the proper KCMO procedure.

22. On June 14, 2017, the date plaintiff's previously scheduled Human Resources Board hearing had been scheduled, it was cancelled without explanation. However, the following day, on June 15, 2017, Plaintiff received a letter, that was backdated to May 26, 2017. Here, KCMO paid Plaintiff his retroactive wages pay and other benefits in order to foreclose any claim Plaintiff might have for those benefits that had accrued. By this letter, KCMO also made it clear that Plaintiff was being paid as a result of his suspension due to having been merely demoted and not terminated as had been the expressed intention of the City.

23. The Plaintiff heard nothing from KCMO on when his Board Hearing would be held until he received a notice that the Hearing was now scheduled for September 13, 2017. However, this, as the prior hearing, was again canceled for an unexplained reason. Finally, on October 25,

2017, Plaintiff was able to have a Human Resources Hearing Board Appeal. At the hearing, Mr. Munoz, the Predetermination Officer who had found that "just cause" did not exist but determined that the Plaintiff should be demoted into retirement, sat with the three panel Hearing Board composed of lawyers that had some affiliation with the City. Mr. Munoz consulted with the other members and appeared to be a member of the Hearing Board; however, his involvement was omitted from the transcript of this hearing. It was not until February 26, 2018 that the Human Resources Board issued its opinion which upheld the findings of the predetermination hearing officer and refused to consider whether the Plaintiff had been forced into retirement.

24. Following the decision issued by the Human Resources Board, Plaintiff, on March 6, 2018, requested a review of the decision by the City Manager as prescribed by the Rules and Policy Manual. (See Exhibit 6 attached).

25. To date, the City Manager has failed to respond despite the passage of 21 months that he and his staff had to review the transcript and exhibits provided to him for this purpose. As of now, the City Manager has resigned to take another position and an acting City Manager is in place while KCMO looks to find a replacement City Manager, making it unlikely that a decision will be forthcoming from the City Manager's office and instead, the rights of the Plaintiff might be barred by existing statutes and thereby depriving him of his rights.

26. Plaintiff has been damaged by these acts.

**COUNT I- FIFTH AND FOURTEENTH AMENDMENT 42 USC § 1983**

27. The Plaintiff hereby incorporates by reference all prior paragraphs stated above as though fully set forth herein.

28. The Fifth and Fourteenth Amendments to the United States Constitution provide an array of rights to persons including procedural Due Process rights of an individual, including the

8

Case 4:19-cv-01016-BP   Document 1   Filed 12/19/19   Page 8 of 10

right to have enforced and applied any state law procedure established as applicable to any administrative proceeding and protection from a governmental actor that creates a stigma against individuals that deprives the individual of tangible rights.

29. The contours of the procedural Due Process rights pertaining to enforcement of applicable state administrative procedures is clearly established under applicable law.

30. Defendant KCMO is a municipality whose power and authority are derived from the laws of the State of Missouri. Defendant KCMO subjected Plaintiff or caused Plaintiff to be subjected to a deprivation of his procedural Due Process rights by failing to enforce its own administrative procedures during the disciplinary process that Plaintiff has been made to endure.

31. Defendant KCMO did so under color of state law.

32. Defendant KCMO has stigmatized the Plaintiff by seeking to terminate him alone with other employees that have been charged with criminal conduct.

WHERFORE, Plaintiff prays the Court for a judgment in his favor against the Defendant for depravation of Constitutional rights, back pay, including wage and benefits increase as well as reimbursement of any lost fringe benefits, retirement plan benefits and contributions, an award of front pay, emotional distress, pre-judgment interest, for reasonable attorney fees, for expert witness fees, costs pursuant to 42 U.S.C. §1988, all in excess of $75,000.00 and for such other relief as the Court may deem just and proper.

## **COUNT II -CONSTRUCTIVE DISCHARGE**

33. The Plaintiff hereby incorporates by reference all prior paragraphs stated above as though fully set forth herein.

34. The terms and conditions of Plaintiff's employment became so intolerable for the Plaintiff that a reasonable person would have been compelled to resign from employment with the

Defendant KCMO and protect the threatened retirement benefits that he had remained as an employee with Defendant and had worked so hard to achieve for both himself and his family that is dependent on him.

35. Plaintiff has sustained damages.

WHEREFORE, the Plaintiff requests the Court enter a Judgment in his favor and against the Defendant City of Kansas City in an amount in excess of $75,000, for his costs, expenses and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff and hereby demands a trial by jury on all triable issues.

Respectfully submitted,

/s/ Benny J. Harding
Benny J. Harding MO #23079
4630 West 137th Street, Suite 100
Leawood, KS 66224
(913) 663-1300 Telephone
(913) 663-3834 Facsimile
Benny@hardingkc.com

and

THE EPSTEIN LAW FIRM, LLC

By: /s/ Mark H. Epstein
Mark H. Epstein    MO # 45401
4630 W. 137th Street, Suite 103
Leawood, Kansas 66224
Phone No. (913) 396-5123
Fax No. (913) 663-3834
Mark@epsteinlawfirmkc.com

ATTORNEYS FOR PLAINTIFF