**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **RAY MARCILLE,** | ) | |
| **PLAINTIFF,** | ) | |
| | ) | Case No. 4:19-CV-01016 |
| **V.** | ) | |
| **CITY OF KANSAS CITY, MISSOURI,** | ) | |
| | ) | |
| **And** | ) | |
| **Greg Bolon** | ) | |
| | ) | |
| **And** | ) | |
| **Michael Kitchen** | ) | |
| **DEFENDANTS.** | ) | |

<u>**AMENDED COMPLAINT**</u>

COMES NOW Plaintiff, Ray Marcille, by and through counsel and for his Complaint against the Defendants City of Kansas City Missouri ("KCMO" or "City"), Greg Bolon ("Bolon") and Michael Kitchen ("Kitchen") and states as follows:

<u>**PARTIES, JURISDICTION AND VENUE**</u>

1.      Plaintiff Ray Marcille had been a long-time employee of the City of Kansas City, Missouri, working with the City for almost 32 years and for 22 years was the Superintendent of the Signs and Marking section of the Public Works Department for KCMO.

2.      City of Kansas City, Missouri is a municipality organized pursuant to the laws of the State of Missouri and operates as a City Manager form of municipal government, lawfully derives its powers from the laws, statutes and Constitution of the state of Missouri and the United States of America.

3.      Greg Bolon is a long-time City employee who oversaw operations in various Public Works departments for the City including Signs and Marking since May of 2016. Defendant Bolon

1

is being sued in his individual capacity and can be served at City Hall, 414 E. 12th Street, Kansas City, Missouri 64106.

4.     At all times relevant Michael Kitchen was an employee in the Human Resources Department of the City.   Defendant Kitchen is being sued in his individual capacity and     can be served at City Hall, 414 E. 12th Street, Kansas City, Missouri 64106.

5.     This action arises under the Constitution of the United States of America,  42 U.S.C. § 1983 and 42 U.S.C. § 1985.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a), 42 U.S.C. §1983 and 42 U.S.C. § 1985 for Plaintiff's due process, equal protection claim and  his claim for conspiracy to interfere with Plaintiff's civil rights.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 (b).

## FACTS COMMON TO ALL COUNTS AND ADMINISTRATIVE PROCEEDINGS

7.     Plaintiff, during his extensive career as a KCMO employee, and most recently, for the last 22 years as the Sign and Marking Section Superintendent, has served under several supervisors.  For a 15 year period, he served under Mr. Wei Sun, P.E. who found his job performance to often exceed expectations.  During the last seven or so months, Greg Bolon served as his supervisor and did not issue him a performance rating.   The ratings that he received from Mr. Sun were typical of his performance found during most of his career.

8.     Mr. Wei Sun found that Plaintiff "substantially and consistently exceeded overall expectations".  Mr. Sun, who is now the City traffic engineer, rated him highly for many years and believed Plaintiff to be honest, hardworking, prideful of his work and Sun believed that Plaintiff always did his best in meeting established goals.  Sun and Plaintiff would meet, review available funds and budget, then establish performance goals and objectives for the department based on the prior year's performance and Plaintiff always met those targets.   Mr. Sun had the overall

2

administrative responsibility for the department and set its budget and performance objectives from one year to the next.

9.      In order to meet the goals and objectives of the Signs and Marking section established between Mr. Sun and the Plaintiff, it was necessary to work weekends and for at least one of the two supervisors subordinate to the Plaintiff to also assure that the goals and objectives would be met and be on call to meet a call out when no one else responded.

10.      Bolon who had 20 years of experience with the City Public Works Department; principally in operations for the street maintenance department that responded to snow removal and pothole repair among other things. In May of 2016, he had added to his responsibilities the Signs and Markings section of public works.  While having some understanding of the mission of the section, he never had any real knowledge of what the Plaintiff did, how he did it and what the Plaintiff had access to in the performance of his duties.  Bolon developed an abnormal dislike for the Plaintiff that motivated acts adverse to the Plaintiff and designed to obtain Plaintiff's  ouster.

11.      Plaintiff  had two supervisors that he oversaw.  Theo Bagby, the signs supervisor and Ed Simsizer, the supervisor of the marking department.  These two men oversaw their direct work crews, were responsible for the crews' direct supervision, had access to the personnel records, prepared reviews of the crews' performance and were responsible for the payrolls of their crews. Plaintiff had no direct responsibility or oversight of these tasks that had been specifically delegated to the supervisors.

12.      Unknown to Plaintiff, a criminal scheme had been operating in the Signs and Marking section for several years.  A few workers would arrange fraudulent overtime based on bogus callouts for emergency repair or replacement work where no actual work or repairs were needed or performed.   The section had a predetermined overtime schedule of workers who had

volunteered to be available each workday evening. They would be called to perform the repair or emergency work should such an occasion arise. On the days that specific employees were scheduled to have to call out responsibility, phone calls would come into the appropriate emergency phone number (often anonymous) and the scheduled workers would then go out and allegedly perform the required work, or so it was intended. Also, by union contract these workers were paid a minimum of four (4) hours of overtime. Based on information and belief, this scheme was allegedly in place from January 2013 until November 2016 and cost the City approximately $58,000 over that period and involved six (6) offenders. At no time was Plaintiff aware of or involved in this scheme until it was subsequently discovered.

13. To facilitate this scheme, it appeared that the workers would have family and friends, and possibly even one another place the bogus emergency calls reporting missing or damaged signs that were considered essential. Then the scheduled overtime employee would supposedly go out and perform the essential sign work and in that fashion generate the overtime pay. Often the workers never went to the sites or left home for work; they just received extra compensation for doing nothing.

14. In May of 2016, Bolon became Plaintiff's supervisor and Sun was reassigned to the City Traffic Engineer position. Almost from the beginning, Bolon was critical of Plaintiff, finding fault with what he was doing including how they communicated. Also, Bolon sought to cut costs for the section which he felt were out of line principally because the weekend work included the scheduling of a supervisor to be available with the workers. Bolon disputed use of City funds for this purpose without inquiring as to why it was ever felt necessary or why his predecessor had ever authorized it. Bolon's frame of reference was from street maintenance where overtime while rare, did involve an "all hands on deck" approach during snowstorms or other incidents. So, with a total

4

disregard for how the department had been operated or the purposes for the scheduled weekend work which had predetermined goals and objectives that had been agreed to by the Plaintiff with Mr. Sun. These targets were based on the department being able to maintain and service the 150,000 signs in place throughout the city and the many hundreds of miles of striping and painting that was the responsibility of the section and had to be performed each year. First, Bolon banned supervisors from performing Saturday work; then, from reviewing financial reports, he sought to curtain all overtime because he believed that signs and marking was spending too much on overtime when compared to the other Public Works departments; i.e. street maintenance. Plaintiff objected because he understood that without the Saturday work and other overtime, he would not be able to meet the section's predetermined goals and objectives and that would reflect poorly on him and the section. Over time, Bolon's relationship and interaction with the Plaintiff further deteriorated to the point that they barely spoke.

15. By August of 2016, Bolon, whose examination of the overtime pay caused him to suspect that something was not right with the overtime pay and the emergency call outs. At no time did he confer with the Plaintiff or other section leaders for the purpose of determining how Plaintiff performed oversight over the section or what information and records Plaintiff had available to him. Instead, he isolated the Plaintiff away from any investigation leaving him without knowledge of Bolon's suspicions. Bolon even undertook a more hands-on investigation that included follow up and actually visiting sites that were allegedly serviced. Bolon involved other City departments and their employees in his investigation. Due to his dislike of the Plaintiff, it was easy for Bolan to erroneously suspect that the Plaintiff was somehow involved in this criminal overtime scheme.

5

16.     Over time, the City conducted their investigation and determined who they believed was involved in this criminal conduct.  So, in order to interview each of the targeted parties on December 20, 2016 a phony safety meeting was called for the Signs and Marking section.

17.     On or about December 20, 2016, Public Works Department and the Human Resources Department were present at the phony safety meeting.  During that meeting, the "suspects" were asked to remain while all the other employees were dismissed.  Also, in attendance were union stewards and other Public Works and Human Resources employees. Plaintiff and the other remaining alleged offending workers were interviewed separately.  Plaintiff was interviewed by Defendant Kitchen and Jolita Smith who took notes of Plaintiff's response to Kitchen's questions. While each of the other "suspects" had representatives available to help protect their rights, Plaintiff had no one and was required to fend for himself since he was viewed as a member of management. Following the conclusion of these interviews, the "suspects" and Plaintiff were placed on indefinite suspension so that a further investigation into the overtime scandal at Signs and Marking section could be performed.  Along with Plaintiff, other employees were also placed on suspension pending the outcome of an investigation, characterized as an investigation of alleged theft of funds from KCMO.

18.     Michael Kitchen was an employee of the City working as the Manager, Labor and Employment Relations for the Human Resources Department of the City.  He interviewed the Plaintiff originally on December 20, 2016 and again on February 22, 2017.  He also was instrumental in denying Plaintiff his accrued benefits and made other punitive demands on Plaintiff all designed to damage Plaintiff and deprive him of his rights.  Rather than exercise his decision making authority so that Plaintiff might appeal the false accusations made against him, Kitchen acted with malice and an overriding desire to punish the Plaintiff for the actions of others.

6

19.     Plaintiff and the other "suspects" were interrogated by two person teams from the Human Resources department of KCMO on December 20, 2016.  Each of the "suspects" were separated from one another and not permitted to speak with one another.  The unscheduled safety meeting had turned in to an interrogation of the accusations made against each of the employees including the Plaintiff and he was treated as if he was guilty of the crime that had been committed. During the interrogation, Plaintiff expressed shock and surprise over the entire matter and claimed that he knew nothing, nor was he involved in any fashion with the scheme, nor that he received any of the alleged wrongly taken money.  Despite his protestations and denial of any knowledge or involvement, Michael Kitchen accused Plaintiff of violating City policies and procedures.

20.     As of December 20, 2016, Plaintiff was suspended pending the outcome of the investigation.  Then on January 5, 2017, that suspension was extended, and on January 19, 2017, once again extended. (See Exhibits 1, 2, 3 Attached).

21.     Bolon or Kitchen failed to conduct an adequate investigation of the events either prior to December 20, nor after that indicated or concluded the Plaintiff had any role in the illegal scheme.  Nor that Plaintiff had any knowledge or awareness of the scheme or had any reason to believe that members of The Signs and Marking section were involved in such a scheme.  Also, neither Bolon or Kitchen were actually familiar with what Plaintiff did during his work day, what access he had to the personnel records of the crews, their phone numbers or other personal information of any of the other employees within the section.  That, of course, did not prevent Bolon from speculating as to what information Plaintiff did have available so that he might have detected the illegal scheme.  Kitchen angered that such illegal conduct had occurred in a department that he had been responsible for sought to blame the Plaintiff for what had happened so as to deflect blame from himself.

7

22.     On or about February 22, 2017, while still suspended and still viewed as a co-conspirator, Plaintiff was interviewed a second time, by Michael Kitchen and this time Teri Casey, a Senior HR specialist with KCMO who took notes.  And while no evidence for either interview indicated that the Plaintiff had participated in this criminal scheme or had any knowledge of criminal acts taking place in Signs and Marking, Kitchen suspended Plaintiff following the first interrogation.  Now, Kitchen was recommending Plaintiff for termination with instruction not to be rehired at the conclusion of his suspension.

23.     Also, the Human Resources Rules and Policy Manual provided for three separate review steps for appealing employment discipline.  The initial step was the predetermination hearing before a predetermination hearing officer who is to determine if "just cause" exists for the recommended action.  From that an Employee may appeal that determination to a three-member Human Resources Board so long as the appeal is sought within ten (10) days of the predetermination Hearing ruling.   All decisions of the Human Resources Board are then subject to review by the City Manager and must be appealed here within ten (10) days of the decision of the Human Resources Board being delivered.

24.     In compliance with the policies and procedures of KCMO, Plaintiff timely requested a predetermination hearing.  Then on March 10, 2017, Plaintiff was notified that his investigation had been completed and that his suspension was now changed to a suspension without pay but also that management was recommending that he be terminated and a DO NOT HIRE notice be made in his file following the second interview conducted by Kitchen.  At the same time, Plaintiff was notified that on March 22, 2017, the Predetermination Hearing would be held. This first step in the employee discipline appeal process was held before Mr. Nelson Munoz, an attorney employed by the law department of KCMO.  Following the hearing, on April 4, 2017,

8

a decision was rendered by Mr. Munoz that overruled the permanent termination of the Plaintiff. Munoz found that KCMO failed to prove "just cause" to support Plaintiff's termination and reinstated Plaintiff as a City employee. However, Mr. Munoz instead of returning the Plaintiff to his previous Superintendent position, demoted Plaintiff two levels and required that he return to work in the field as part of the department.

25.     This demotion represented a significant reduction in pay and benefits and was devastating to Plaintiff's retirement planning. The retirement benefits of KCMO employees are calculated on an employee's last three years' earnings. This demotion would have severally reduced Plaintiff's retirement benefits that he had earned from long term loyal service to the City. Plaintiff mindful of the dire consequences that this determination meant to his retirement plans once again timely appealed this decision to the Human Resources Hearing Board. (Copy of the predetermination ruling and the notice of appeal to the Human Resources Hearing Board are attached as Exhibits 4 and 5).

26.     On April 12, 2017, Plaintiff gave his notice requesting a Hearing before the Human Resources Board for a de novo hearing of his case. However, on April 13, 2017, KCMO began implementation of predetermination Hearing Decision.  Plaintiff received a notice of his involuntary demotion to non-supervisory Labor leader position that was to be effective in four (4) days on April 17, 2017.  He was also advised that he would not be eligible for promotion for one (1) year.  Plaintiff was then advised to report to work April 18, 2017 as a laborer, which was to occur prior to the Human Resources Board Appeal that he was pursuing.

27.     In an effort to preserve his appeal rights and make them meaningful; Plaintiff sought to delay his required reporting to the new position until after the Board hearing.  Over his career with the City, Plaintiff had accrued the equivalent of approximately one year's personal

9

leave time. Armed with all of these leave days, he asked Kitchen for permission to use his leave time pending his appeal to the hearing board. However, Kitchen who had the authority to grant Plaintiff's request denied the Plaintiff. Instead, Kitchen insisted that not only was Plaintiff's demotion to take effect as scheduled, but should Plaintiff fail to report to his new position, he would be terminated for not reporting and "abandoning" his job. Kitchen had the authority to use his discretion and permit Plaintiff to use his personal leave time; but his personal animus of the Plaintiff and bad faith denied the Plaintiff this right and further threatened Plaintiff with termination should he not report.

28.     As a result, Plaintiff was forced to retire against his wishes as an active employee in order to preserve his accrued retirement benefits rightfully earned during his long service to the City and elected to pursue his rights and remedies within the proper KCMO procedure. By retiring, Plaintiff also forfeited the value of one half of his personal leave time, all to his loss and detriment and with the knowledge of Kitchen as to what would happen to the accrued leave. Kitchen acted with a callous indifference to the best interest of the Plaintiff because he maliciously wanted the Plaintiff punished.

29.     Regarding Plaintiff's appeal rights, for eight (8) weeks nothing happened after Plaintiff was forced to retire until June 14, 2017. On that date a previously scheduled Human Resources Board hearing had been scheduled for Plaintiff, was abruptly cancelled without explanation. Then, the following day, on June 15, 2017, Plaintiff received a letter, backdated to May 26, 2017 from the City. Now after the Plaintiff had retired, KCMO paid Plaintiff his retroactive wages and other benefits in an effort to foreclose Plaintiff's claim for those benefits that had accrued. By this letter, KCMO also made it clear that Plaintiff was being paid while on

10

suspension due to having been merely demoted and not terminated as had been the expressed intention of the City, Bolon and Kitchen.

30.     The Plaintiff heard nothing further from KCMO on the rescheduling of his Board Hearing until he received a notice that the Hearing was now scheduled some 22 weeks after his forced retirement and 25 weeks following his predetermination hearing. He now learned that his board hearing would be set on September 13, 2017. However, just as the prior hearing, it was also canceled for an unexplained reason.     Finally, on October 25, 2017, Plaintiff had a Human Resources Hearing Board Appeal. This was 28 weeks following his retirement and 32 weeks following his predetermination hearing. At the hearing, Mr. Munoz, the Predetermination Officer who had found that "just cause" was absent to terminate the Plaintiff and had ordered Plaintiff reinstated was also present. However, Munoz had also determined that the Plaintiff should be demoted into retirement. He sat with the three member panel Hearing Board composed of lawyers that had some affiliation with the City. Mr. Munoz consulted with the Board members and appeared to be a member of the Hearing Board himself. His involvement was omitted from the transcript of this hearing. At the conclusion of the hearing, all exhibits were left with the City. Teri Casey from the City's Human Resources Department emailed Plaintiff's counsel and agreed to provide the exhibits to the City Manager's office should an appeal there be necessary. It was not until February 26, 2018, now 51 weeks after Plaintiff's forced retirement, 54 weeks after the predetermination hearing and 61 weeks following Plaintiff having been falsely accused that the Human Resources Board issued its opinion which upheld the findings of the predetermination hearing officer and refused to consider whether the Plaintiff had been forced into retirement.

11

31.     Following the decision issued by the Human Resources Board, Plaintiff, on March 6, 2018, requested a review of the decision by the City Manager as prescribed by the Rules and Policy Manual.  (See Exhibit 6 attached).

32.     Only after the Plaintiff filed his original Complaint, did he receive a shocking response from the City Manager's office.  On January 31, 2020, the City Manager's office finally acknowledged Plaintiff's appeal request and then pointed out that only the transcript and the City exhibits had been reviewed, pointing out that while the Plaintiff had no responsibility to provide anything, he had not provided any exhibits or the transcript although the City's Human Resources Department had agreed to provide them in the event of a City Manager's Appeal.  The conclusion reached was only based only on what had been provided by the City.  As the attached exhibit verifies, Meera Mahalingam, an assistant City Manager upheld the Board's determination. (See Exhibit 7 attached).

33.     Plaintiff has been damaged by these acts.

## COUNT I- FIFTH AND FOURTEENTH AMENDMENT 42 USC § 1983

34.     The Plaintiff hereby incorporates by reference all prior paragraphs stated above as though fully set forth herein.

35.     The Fifth and Fourteenth Amendments to the United States Constitution provide an array of rights to persons including procedural and substantive Due Process rights of an individual, including the right to have enforced and applied any state law procedure established as applicable to any administrative proceeding and protection from a governmental actor that stigmatize individuals that deprives the individual of tangible rights.

36.     The contours of the procedural Due Process rights pertaining to enforcement of applicable state administrative procedures is clearly established under applicable law.

12

37. Defendant KCMO is a municipality whose power and authority are derived from the laws of the State of Missouri. Defendant KCMO subjected Plaintiff or caused Plaintiff to be subjected to a deprivation of his procedural Due Process rights by failing to meaningfully enforce its own administrative procedures during the disciplinary process that Plaintiff has been made to endure.

38. Despite providing lip service to administrative review rights for employees subject to discipline as employees of KCMO, the City failed to adhere to those written policies and violated basic due process rights assured to all persons, to-wit:

    a) failure to conduct adequate investigation of the Plaintiff and each wrongdoer.

    b) failure to understand and know the limits of Plaintiff's access to personnel information, budgets, action center information or overtime payment records.

    c) falsely accuse Plaintiff of being a co-acter with the actual wrongdoers and aware of their scheme despite never finding any evidence that Plaintiff nor his superior had that knowledge.

    d) By erroneously determining that Plaintiff should have known of the existence of an illegal overtime plot despite the absence of any evidence to support this conclusion; which was either a conclusion made by Bolan and Kitchen or an assumption made by an actual wrongdoer.

    e) By isolating and separating Plaintiff from his workplace and coworkers, despite Plaintiff's steadfast denial of any role or even awareness of the crime conspiracy that took place.

13

f) By Bolon maliciously labeling the Plaintiff as a wrongdoer that was part of the conspirators that stole money from KCMO despite being unable to find any evidence of the same.

g) By Bolon maliciously disliking the Plaintiff so intently that he urged his termination as he sought to hold someone in authority responsible for the criminal acts of others despite being unable to provide any evidence that Plaintiff was involved as someone who should have known despite the absence of any means to have known of the criminal conduct being available.

h) By Kitchen maliciously recommending Plaintiff for termination with a do not rehire recommendation due to his personal dislike of the Plaintiff. Kitchen sought Plaintiff's ouster because he had been required to interview him twice and still was not able to produce any incriminating probative evidence that could be used against the Plaintiff.

i) By delaying a predetermination hearing for Plaintiff within a reasonable length of time so that the Plaintiff might be able to clear his good name earned with the City for over 32 year career that he had established with KCMO and return to his former position.

j) While the predetermination Hearing Officer was able to determine that the City had failed to sustain its burden of proof and find "just cause" for Plaintiff's suspension but instead resulted in his reinstatement, Munoz erroneously concluded that the Plaintiff's denial of access to the budget (except for setting the annual goals as he had with Mr. Sun previously) or individual employee

14

time records that might have disclosed the criminal conduct was not credible, despite the absence of any evidence.

k)  That the reduction in position by two levels was punitive in nature and the result of the conclusion reached by the predetermination hearing officer which was based on his personal belief and no actual evidence. It was also contrary to the testimony of the Plaintiff that he disregarded.

l)  That the reduction in position was deliberate and made in bad faith.  It was intended to cause the separation of the Plaintiff from KCMO and was a harsh, and overly punitive punishment that should have been reversed at the Human Resources Hearing Board hearing.  By imposing such a harsh and punitive penalty without any genuine evidence to support it, the predetermination hearing officer effectively identified the Plaintiff as a wrongdoer the same as those that actually stole money from the City.

m) By Kitchen maliciously refusing to permit Plaintiff to take his accrued leave and use these benefits, Kitchen deprived the Plaintiff of a reasonable opportunity to clear his name while retaining his position as Superintendent of his section for the same or similar wages that he was earning at the time. Instead, Kitchen acted with malice as he backed Plaintiff into a corner with his refusal which required Plaintiff to retire but at a steep financial cost, since the policy of KCMO required the forfeiture of one half of the accrued leave time due Plaintiff.

15

n) Kitchen and Bolan each knew that by forcing Plaintiff into retirement they could attribute blame and fault on to the Plaintiff and replace him with another employee at a lower compensation level resulting in a net savings to KCMO.

o) By repeatedly scheduling and canceling Plaintiff's appeal to the hearing board they (Kitchen and others in the Human Resources department of the City) effectively denied Plaintiff of any opportunity to retain his prior position and the justice he was entitled to receive. It also kept Plaintiff's name associated with the actual criminals among Plaintiff's work peers and associates and stigmatized the Plaintiff of being guilty of criminal conduct.

p) Then, by conducting an appeal hearing where the board was influenced by an unsworn witness advocating his prior position violated Plaintiff's rights to a fair and impartial hearing that was intended to provide him an opportunity to clear his good name. Instead the Board permitted the predetermination hearing officer to sit with the Hearing Board members and advocate in favor of his determination. This effectively negated the impartiality of the Board and allowed an extra prosecution witness to testify without being subjected to cross examination all in violation of Plaintiff's procedural and substantive due process.

q) Deprived Plaintiff of the procedural rights granted to all city employees in disciplinary matters which included an appeal to the office of the City Manager. While Plaintiff filed his appeal within the appropriate time and provided whatever information was required of him (the Human Resources Department took possession of all of the exhibits and agreed to submit them to the City

16

Manager, however it appears only the City exhibits were submitted) it was ignored by several persons having the role of City Manager for over 21 additional months and then provided a ruling after the Plaintiff's Complaint was filed and admittedly based on an incomplete record while never contacting or advising Plaintiff of any alleged deficiency in what was submitted. Also, the determination was not made by the City Manager; but rather, an Assistant City Manager who admitted to making a determination based on an incomplete record and further denied Plaintiff of the due process he was entitle to receive.

39.     Defendants KCMO, Bolan and Kitchen all did so under color of state law.

40.     Defendants KCMO, Bolan and Kitchen have stigmatized the Plaintiff by shaming and humiliating him and seeking to terminate him alone with other employees who were actually involved in criminal activity and  have been charged with criminal conduct, and by all of the specific conduct previously identified herein as well as by the actions that may be further determined in discovery.

WHERFORE, Plaintiff prays the Court for a judgment in his favor against the Defendants and each of them for depravation of Constitutional rights, statutory rights, back pay, including wage and benefits increase as well as reimbursement  of any lost fringe benefits, retirement plan benefits and contributions, an award of front pay, emotional distress, pre-judgment interest, for reasonable attorney fees, for expert witness fees, costs pursuant to 42 U.S.C. §1988, all in excess of $75,000.00 and for such other relief as the Court may deem just and proper.

## <u>COUNT II -CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS 42 USC § 1985</u>

41.     The Plaintiff hereby incorporates by reference all prior paragraphs stated above as though fully set forth herein.

42.     Defendants Bolon and Kitchen as well as other employees combined together to act in concert to commit acts that would deprive the Plaintiff of his civil rights. They did so by either performing illegal acts or lawful acts by unlawful means. They combined together to inflict a wrong and injury upon the Plaintiff and the overt act that took place resulted in damages and injury to the Plaintiff.

43.     These defendants, after having included Plaintiff in their investigation of the illegal overtime call out scheme that was discovered, were unable to find any evidence linking Plaintiff to the scheme or that he had knowledge of the scheme or its actors' involvement. Rather than reinstating the Plaintiff and focusing their efforts on the actual criminals, they acted in concert but separately seeking to justify the actions taken against the Plaintiff that ultimately resulted in his retirement and related damage.

44.     Bolon had such animus towards Plaintiff that he ignored the absence of any direct evidence against the Plaintiff and urged the Human Resources Department and Kitchen to seek a basis of removing Plaintiff from his position. Kitchen acted maliciously against the Plaintiff because he was upset and angry that the overtime call out scheme had allegedly been in place for several years so it would reflect unfavorably on him. He sought to affix blame for the scheme somewhere else and Plaintiff was the likely targeted since he had been swept up in Bolon's dragnet.

45.     Both Bolon and Kitchen realized that they could not prove that Plaintiff was involved or had knowledge of the illegal scheme, but both needed a scapegoat. Bolon, in order to correct what he considered excessive overtime pay going to Signs and Marking employees when compared to what was being paid to street maintenance workers. Kitchen sought someone to take the blame and divert attention form himself that the scheme had continued for several years under his nose.

18

46.     Both agreed that Plaintiff should be blamed for the loss the City sustained and since no evidence could be found that he was involved or knew of the illegal conduct; they conspired to cast the Plaintiff as a wrongdoer because he should have known despite no means being available to show that he should have known of the illegal acts.

47.     The actions of these Defendants and others who are currently unknown but who may be identified during discovery, were intended to deprive Plaintiff of his civil rights, and did so deprive the Plaintiff of those rights all to his damage.  Specifically, Bolon and Kitchen acting in concert but separately had a meeting of the minds when they:

a)  Continued to pursue the Plaintiff after failing to find any evidence of his involvement in the illegal acts.

b)  Attribute false information to the Plaintiff so that  they might justify retaining him as a "suspect party" including falsely claiming that he had access and oversight responsibility of the payroll, or overtime payments made to the actual offenders.

c)  By suspending the Plaintiff during an alleged investigation that revealed no basis for continuing to further suspend the Plaintiff, yet further suspending the Plaintiff with a recommendation to terminate him and also "do not rehire" reference placed in Plaintiffs file.

d)  By refusing to release and separate Plaintiff from the accusations that had been found to be baseless against him and could not be attributed to him despite requiring Plaintiff to submit to two separate interviews by Kitchen and others in Human Resources Department

19

e) In aiding in denying the Plaintiff timely responses to each step of the administrative review procedure provided by the City's policy so that they effectively denied Plaintiff the continuation of his position with the City and denied him the justice that he sought.

f) In failing to allow Plaintiff to use his accrued personal time, be it earned sick leave or vacation time as he sought the justice that he was entitled to receive from his long-time employer. And then causing him to forfeit a portion of the benefits when he was forced to retire.

48. The terms and conditions of Plaintiff's employment became so intolerable for the Plaintiff that a reasonable person would have been compelled to resign from employment with the Defendant KCMO and protect the threatened retirement benefits that he had remained as an employee with Defendant and had worked so hard to achieve for both himself and his family that is dependent on him.

49. Plaintiff has sustained damages.

WHERFORE, Plaintiff prays the Court for a judgment in his favor against the Defendants and each of them for depravation of Constitutional rights, statutory rights, back pay, including wage and benefits increase as well as reimbursement of any lost fringe benefits, retirement plan benefits and contributions, an award of front pay, emotional distress, pre-judgment interest, for reasonable attorney fees, for expert witness fees, costs pursuant to 42 U.S.C. §1988, all in excess of $75,000.00 and for such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiff and hereby demands a trial by jury on all triable issues.

20

Respectfully submitted,

/s/ Benny J. Harding
Benny J. Harding MO #23079
4630 West 137th Street, Suite 100
Leawood, KS 66224
(913) 663-1300 Telephone
(913) 663-3834 Facsimile
Benny@hardingkc.com

and

THE EPSTEIN LAW FIRM, LLC

By:      /s/ Mark H. Epstein
         Mark H. Epstein       MO # 45401
         4630 W. 137th Street, Suite 103
         Leawood, Kansas 66224
         Phone No. (913) 396-5123
         Fax No. (913) 663-3834
         Mark@epsteinlawfirmkc.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been submitted for filing through the ECF filing system which has forwarded a copy to all counsel of record on this the 12th day of August 2020.

/s/ Benny J. Harding
Benny J. Harding

21